UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

COLE BRYANT, 04-B-1046,

           Petitioner,

       -v-                                  09-CV-302(MAT)
                                                  **ORDER**
DAVID A. ROCK,

           Respondent.
_____

## I.   Introduction

*Pro se* petitioner Cole Bryant ("petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in Monroe County Supreme Court of two counts of Sodomy in the First Degree (former N.Y. Penal L. § 130.50(1), (3)) following a jury trial before Justice Joseph T. Valentino. Petitioner is currently serving a determinate term of imprisonment of twenty years.

## II.  Factual Background and Procedural History

On September 16, 2003, petitioner stopped B.E. (or "the victim") as she walked alone to School No. 17 in the City of Rochester, and asked her to use a pay phone to call his niece. T. 348-56.[1]  B.E. held the phone while petitioner dialed, but the call was not answered. T. 351, 353, 356. Police later found the victim's palm print on the phone, and records showed that an

---

[1] Citations to "T.__" refer to pages of the trial transcript; citations to "S.__" refer to the sentencing transcript.

unanswered call was placed from that phone at 8:46 a.m. on September 16. T. 542, 569, 882.

Petitioner then led B.E. behind an abandoned house. When she began screaming, he covered her mouth and told her that if she screamed again, he would punch her in the face. T. 358-60. According to the victim, petitioner then "pulled out his penis" from his pants and "put his private" in her mouth. Afterward, petitioner gave B.E. a piece of "Doublemint" brand chewing gum. T. 360-63. After chewing the gum, B.E. threw the foil wrapper on the ground, where it was later recovered by police. T. 364, 525. Petitioner told B.E. to wait where she was and count to 20. After doing so, the victim ran away and encountered a woman in a car who took her to the police station, where she reported the attack. T. 370-71.

On the date of the incident, police conducted show-up identification procedures with two individuals. B.E. stated unequivocally that neither man was the perpetrator. H, 22-23, 60.[2] That day, Inv. David Blaho ("Blaho") of the Rochester Police Department arranged for B.E. to meet with a police artist, who produced a sketch of the perpetrator based on the victim's description. H. 61. Police also showed B.E. an 18-photo array, as well as 50 photographs on the police department's identity

---

[2] Citations to "H.__" refer to pages of the hearing transcript dated 1/12/2004; citations to "H2.__" refer to the hearing transcript dated 1/26/2004; and those to H3.__" refer to the hearing transcript dated 2/10/2004.

management computer system, but she could not recognize any of the subjects.   Petitioner was not depicted in any of the photographs viewed by the victim. H. 31-32, 62-71, 73.

Two days later, Blaho conducted an identification procedure with a potential witness named Denise Chong ("Chong"). Chong had observed a man staring into the playground at School No. 17 the day before the attack. H. 74-75, 118. She could not identify that person from a series of 116 photographs shown to her, none of which depicted petitioner. H. 76. Blaho then showed Chong a separate, 6-photograph array, and again she did not recognize any of the individuals pictured. H. 77-78.

The following day, September 19, Inv. Ronald Reinstein ("Reinstein") met with petitioner at the Public Safety Building after he had been arrested for an unrelated criminal trespass. H. 161-63; H2. 6; H3. 28-30. Petitioner stated that he was staying with an uncle who lived on Campbell Street in the neighborhood near School No. 17. He also told officers that he "walked the kids to school" and "helps out, watches the kids, and walks them." H. 167. Regarding the day of the incident, however, petitioner said that he would be unable to tell them anything that occurred before 10:00 a.m. that day because he "had a blackout" and had been having "strange dreams" before that. H. 167. Petitioner disclosed that he may have been aware of why the police were speaking with him; that he had a sexual encounter with a 16 year-old girl, and that it "became rough." H. 168. He stated that the girl lived somewhere on

Orange Street. <u>Id.</u> Later that day, petitioner agreed to provide the police with an oral swab for DNA purposes. <u>Id.</u> at 171.

On September 20, 2003, Reinstein and Officer Laurie Kingsley ("Kingsley") showed B.E. a 6-photograph array and instructed her to look at the photographs "to see if there was anyone there she recognized and to let us know if there was anybody in those photographs that harmed her earlier in the week." H. 27-29. Looking at the photographs in order, B.E. stopped at the fifth one and told the officers that "she didn't want to look at photos anymore," and would not continue speaking with the officers. H. 28, 186-88. B.E. stopped at the fifth photo, which depicted the petitioner. H. 50, H2. 80. She did not, however, indicate that she recognized anyone and did not identify the fifth photograph as her attacker.

Approximately one-and-a-half hours later, Reinstein showed B.E. the same 6 photographs from the array in the same order, individually, slightly larger and in color. H. 24-25, 28-29, 44-45, H2. 80. The victim focused her attention on one particular photo. The officers told her "if the bad guy was in any of these photographs, to throw the bad guy out and that Investigator Reinstein would take care of the bad guy." H. 26. In response, B.E. crumpled up and threw petitioner's photo at Reinstein. H. 25-26.

Later that day, investigators went to petitioner's uncle's apartment to speak with petitioner. H. 81-82, 178; H2. 54. While investigators were in the apartment, petitioner told them, without being questioned, "I wanted her to suck my dick. She didn't want

to. I didn't care. I made her do it anyway." H. 87-88, 178; H2. 68. At that time, petitioner was placed under arrest and transported to the Public Safety Building. While he was in the back seat of the police car, petitioner stated, "I am sorry. This is the first time that I did this." H. 88-89. After waiving his Miranda rights, petitioner told investigators that "he stuck his dick in her mouth because of the scent," but did not elaborate on what that meant. H. 93. Petitioner also referred to the chewing gum he gave to B.E. after the incident: "She wanted the gum. I was on Campbell Street. She sucked my dick. I saw the woman in the van pick her up. I thought she was going to take her home and she did not love me anymore." H. 95.

Finally, on September 23,  Blaho showed another photo array to Chong, and she selected the photograph of petitioner as the person she saw staring at the playground of School No. 17. H. 80-81.

The victim, Chong, and the investigating officers testified at petitioner's trial. Petitioner testified on his own behalf, denying that he was the man who accosted and sexually assaulted B.E. T. 917-43. The jury found petitioner guilty of two counts of Sodomy in the First Degree. T. 1149-50. Petitioner was then sentenced to concurrent, determinate terms of imprisonment of 20 years, with 5 years of post-release supervision. S. 13.

Petitioner appealed his conviction to the Appellate Division, Fourth Department, on the following grounds: (1) the trial court erred in declining to reopen the Wade hearing; (2) the trial court

erred in allowing Ms. Chong to testify regarding petitioner's "prior bad act" of staring at the playground; (3) the convictions were not supported by the weight of the evidence; (4) the New York State Constitution requires police to electronically record stationhouse interrogations; and (5) the sentence was harsh and excessive. Resp't Appendix B. The Fourth Department unanimously affirmed the judgment of conviction. People v. Bryant, 43 A.D.3d 1377 (4th Dept. 2007), lv. denied, 9 N.Y.3d 1031 (2008).

Petitioner then filed a timely petition for habeas corpus pursuant to 28 U.S.C. § 2254 on the ground that his conviction was obtained by the use of impermissibly suggestive identification procedures. See Petition ¶ 22 & Attach. For the reasons that follow, the Court finds that petitioner is not entitled to the writ, and the petition is dismissed.

## III. Discussion

### A.   Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state

court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

   A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial

incompetence." <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parsad v. Greiner</u>, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), <u>cert.</u> <u>denied sub nom.</u> <u>Parsad v. Fischer</u>, 540 U.S. 1091(2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

**B.   Merits of the Petition: Identification Claim**

Petitioner's sole claim in this habeas proceeding is that the the pre-trial identification procedures were impermissibly suggestive in violation of his Fourteenth Amendment right to due process, and that the victim's identification testimony should have been precluded at trial.[3] Petition ¶ 22. In support of his contention, petitioner extracts a portion of the victim's testimony

---

[3] Petitioner does not allege in his petition that the trial court abused its discretion in declining to re-open the <u>Wade</u> hearing. A <u>Wade</u> hearing refers to a hearing held pursuant to <u>United States v. Wade</u>, 388 U.S. 218 (1967), to determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so, whether it is independently reliable.

on cross-examination relating to the photo array shown to her by investigators in the police car:

| | |
|---|---|
| Defense Counsel: | Okay.  And where were you sitting? |
| Witness: | In the back seat. |
| Defense Counsel: | And [Reinstein] gave you some photographs? |
| Witness: | Yes. |
| Defense Counsel: | And you held those photographs in your hand? |
| Witness: | Yes. |
| Defense Counsel: | And when [Reinstein] gave you those photographs, did he say anything to you? |
| Witness: | No. |
| Defense Counsel: | Did [Kingsley] say anything to you when she gave you the photographs? |
| Witness: | Yes. |
| Defense Counsel: | And what did [she] say to you? |
| Witness: | Ball up the paper and shoot it at [Reinstein]. |
| Defense Counsel: | Did she say which photograph you should ball up and shoot at [Reinstein]? |
| Witness: | No. |
| Defense Counsel: | And did she or [Reinstein] point to any photograph? |
| Witness: | No. |
| Defense Counsel: | Don't you remember pointing to one of the pictures? |

| | |
|---|---|
| Witness: | No, I don't remember. |
| Defense Counsel: | Well, did [Reinstein] point to any of - - any of those pictures? |
| Witness: | I don't remember. |
| Defense Counsel: | Didn't [Reinstein] say to you, *isn't that the guy in one of those pictures*? |
| Witness: | Yes. |
| Defense Counsel: | And when [Reinstein] said to you, isn't that the guy, was he pointing at one of the pictures? |
| Witness: | I don't remember. |
| Defense Counsel: | Well, let me ask you this: When [Reinstein] said, isn't that the guy, were you holding one of these pictures in your hand? |
| Witness: | Yes. |
| Defense Counsel: | And is that the picture that you balled up and threw? |
| Witness: | Yes. |
| Defense Counsel: | Did you feel any pressure by [Reinstein] to throw that picture? |
| Witness: | No. |

T. 408-10 (emphasis added). Counsel further asked B.E. if she remembered telling three people after the first court appearance that Inv. Reinstein "told you that the photo you were holding in your hand is the guy who hurt you?", to which B.E. answered "yes." T. 411. Counsel then questioned B.E. regarding her ability to select an individual from the array presented to her:

| | |
|---|---|
| Defense Counsel: | And then you went through the pictures a third time, did you? |
| Witness: | Yes. |
| Defense Counsel: | And wasn't it when Exhibit 17E was in your hand that Investigator Reinstein said to you, isn't this the guy? |
| Witness: | Yes. |
| Defense Counsel: | And that's when you took this exhibit, crumbled [sic] it up and threw it at [Reinstein], right? |
| Witness: | Yes. |
| Defense Counsel: | So you did what Investigator Reinstein wanted you to do, didn't you? |
| Witness: | Yes. |

T. 413-14. B.E. also agreed with defense counsel that she met Ofc. Kingsley the week before trial and that Kingsley held up the crumpled photograph of petitioner and told B.E. that it was the photograph she had already picked out. T. 415.

On re-direct examination, B.E. testified to the following: (1) she was shown six photographs by Reinstein and Kingsley in the back seat of the police car; (2) she looked at the pictures three times; (3) she could not remember stopping at any time during the three times she viewed the pictures; (4) she did not say anything to the officers as she viewed the pictures; (5) the officers did not say anything to her as she was viewing the pictures; and (6) she did not do anything with the photos before she "balled [petitioner's photo] up and shot it at [Reinstein]" with her hands.

T. 428-433. B.E. explained that she did that because Reinstein told her, "if you think that that's the one, ball it up and shoot it at him." T. 434.

On the fourth day of trial, defense counsel moved to reopen the <u>Wade</u> hearing, requesting that the court consider B.E.'s cross-examination testimony as part of the <u>Wade</u> hearing, and to "strike [her] identification of my client in court" based upon "the suggestive nature of the statements that both Investigator Reinstein and Officer Kingsley made to the little girl." T. 649. In response, the prosecutor argued that any testimony of suggestiveness was in response to defense counsel's leading questions, and that B.E. was "fully rehabilitated when she was able to explain exactly what happened" on re-direct. T. 649-50. The trial court then concluded that the "possibility of suggestiveness" that cross-examination had yielded was addressed on re-direct, and, although B.E. "changed it a little bit," her testimony had to be evaluated in light of her demeanor on the stand as well as her age, noting that she "seemed somewhat confused from her answers on some occasions." T. 652. Accordingly, the court denied the motion but allowed counsel to argue the issue during his summation and to cross-examine the officers on what they said to the victim. <u>Id.</u>

Both officers subsequently testified that, when they showed B.E. the photo array, they did not say anything to her, nor did they gesture in any way to suggest that she should select a particular photograph. T. 677, 777.  When the victim viewed the

photo array, she stopped at the fifth photo and "stated that she didn't want to look at any more photos and didn't want to be questioned." She did not indicate that she did not recognize anyone in the photos. T. 679-80. Whey they subsequently showed B.E. the individual photos, she "looked through them briefly. When she came to [petitioner's] photo, she stared at it for a couple of seconds. She went through again. She did this twice. And on the third time when she came to [petitioner's] photograph, she crumbled [sic] it up and threw it at myself and it bounced off the car window. She picked it up and tried to throw it out of the window." T. 384, 782. Neither Reinstein nor Kingsley said anything to B.E. while she viewed the photos. T. 685, 750, 782. On cross-examination, Reinstein denied saying "isn't that the guy" while B.E. held petitioner's photo. T. 743, 805.

The Appellate Division upheld the trial court's denial of petitioner's motion to reopen the Wade hearing and the admission of the victim's identification testimony:

> [D]efendant contends that Supreme Court erred in denying his motion to reopen the Wade hearing after the victim testified at trial that one of the police officers who showed her a photo array pointed to one of the photographs and said, "[I]sn't that the guy in one of those pictures." In denying defendant's motion, the court stated that the victim "seemed somewhat confused" during her testimony and ruled that it would allow defense counsel to point out the identification issue to the jury during summation. The court also permitted defense counsel to cross-examine the police officers involved in the identification procedure, and

> both officers denied directing the victim to
> select a particular photograph. We therefore
> conclude that the court did not abuse its
> discretion in denying defendant's motion to
> reopen the Wade hearing. In any event, there
> is overwhelming evidence of defendant's guilt
> and no significant probability that defendant
> otherwise would have been acquitted, and thus
> any error in the court's denial of defendant's
> motion is harmless.

People v. Bryant, 43 A.d.3d 1377, 1378 (4th Dept. 2007) (citing

People v. Crimmins, 36 N.Y.2d 230, 241-242 (1975)).

   "A defendant's right to due process includes the right not to

be the object of suggestive police identification procedures that

create 'a very substantial likelihood of irreparable

misidentification.'" United States v. Concepcion, 983 F.2d 369, 377

(2d Cir. 1992) (quoting Simmons v. United States, 390 U.S. 377, 384

(1968)); accord, e.g., Neil v. Biggers, 409 U.S. 188, 198 (1972).

The Supreme Court has established a two-step inquiry for evaluating

the constitutionality of in-court identification testimony based on

out-of-court identification procedures. E.g., Neil v. Biggers, 409

U.S. at 198. The inquiry requires a determination of whether the

identification process was impermissibly suggestive and, if so,

whether it was so suggestive as to raise a very substantial

likelihood of irreparable misidentification. Id.; accord, e.g.,

United States v. Wong, 40 F.3d 1347 (2d Cir. 1994). Even if the

pretrial identification procedure is found to have been unduly

suggestive, the trial court nevertheless may allow in-court

identification testimony provided that the identification is

independently reliable. <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977); <u>accord, e.g.</u>, <u>Jarrett v. Headley</u>, 802 F.2d 34, 42 (2d Cir. 1986).

"In evaluating whether or not a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array." <u>United States v. Thai</u>, 29 F.3d 785, 808 (2d Cir.) (citations omitted), <u>cert. denied</u>, 513 U.S. 977 (1994). "If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs, or the utterance of suggestive comments before an identification is made, the 'principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" <u>Id.</u> (quoting <u>Jarrett v. Headley</u>, 802 F.2d at 41 (quoting <u>United States v. Archibald</u>, 734 F.2d 938, 940 (2d Cir. 1984)); internal citations omitted).

Petitioner's argument rests on a selective reading of the trial transcript. Although the victim apparently agreed with defense counsel that Reinstein pointed to petitioner's photo and said, "isn't that the guy," the trial court observed that she seemed confused by this line of questioning. T. 409-10, 413-14, 652. The court further determined that any "possibility of suggestiveness" had been answered by her testimony on re-direct examination. T. 651-52. Indeed, the transcript of B.E.'s re-direct

examination reflects that she twice stated that neither officer said anything to her about the photos or a specific photo  as she viewed the array. T. 430-31, 433-35.  The two officers testified to the same effect during their re-direct examinations. T. 685, 750, 782.  Accordingly, the trial court's factual finding that no comments were made to the victim while she looked at the photographs was not an unreasonable determination in light of the evidence. 28 U.S.C. § 2254(d)(2).

Moreover, Reinstein's instruction to B.E. to ball up the photograph of the person she thought was the perpetrator was not impermissibly suggestive. Indeed, "comments including 'we can't just take a possibly,' made by a police officer to an identifying witness before she examined the second of two versions of the same line-up, See United States v. Wong, [40 F.3d 1347, 1358-59 (2d Cir. 1994)], and 'stick to your guns,' made by a prosecutor to an identifying witness before trial, see Jarrett v. Headley, 802 F.2d at 45-46, have been found not to be impermissibly suggestive." Velazquez v. Poole, 614 F.Supp.2d 284, 324 (E.D.N.Y. 2007); accord, e.g., U.S. v. Brown, No. (S1) 94 Cr. 631 (AGS), 1995 WL 464956, *4 (S.D.N.Y.,1995) (Detective's question to witness, "did he recognize anyone" was not impermissibly suggestive).  Further, there is no evidence on the present record that investigators pressured B.E. to make an identification.

Assuming, arguendo, the procedure was improper, the victim's identification was independently reliable. The Supreme Court has

directed that "the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. at 200.

Applying the Biggers factors, the Court notes that B.E. observed petitioner for a substantial period of time, as she accompanied him to a payphone to place a call. Her description of petitioner was used by a forensic artist to create a sketch that was then introduced into evidence at trial and viewed by the jury. While the victim's "level of certainty" did not significantly bolster the identification's reliability, it also did not detract from it as she ultimately selected petitioner's photograph and gave officers the impression of relief when she threw his photograph at Reinstein. Finally, the victim viewed the photo array four days after the incident, which the Court acknowledges weighs slightly against reliability. However, when evaluated in light of the "totality of the circumstances," the victim's identification was reliable. Neil v. Biggers, 409 U.S. at 199-200.

Finally, any error in allowing the identification testimony was harmless. See Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001) (noting that corroborative evidence of guilt is properly considered under harmless error analysis). Petitioner told police that he had

"blackout" and could not remember where he had been on the morning in question, see T. 832-33, followed by a spontaneous admission that he "wanted her to suck my dick . . . I made her anyway." T. 694. The physical evidence collected from the scene corroborated the victim's account of what transpired behind the house. T. 525, 542, 569, 882. In addition, police found the same brand of chewing gum in petitioner's house that B.E. told police petitioner gave her to chew immediately after the attack. T. 362-63, 838. Petitioner was also positively identified the same man seen the day before the crime staring at the school playground. T. 308-14. Finally, the jury had before it the forensic sketch, which was made before the victim's identification, which she said was "almost a 10" on a scale of 1 to 10 in terms of resemblance to the perpetrator. In light of the evidence of petitioner's guilt in this case, any error in allowing B.E.'s in-court identification of petitioner would not have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also Raheem, 257 F.3d at 142.

In sum, the Court finds that the state courts' rejection of petitioner's due process claim was not contrary to, or an unreasonable application of clearly established Federal law, and the petition is dismissed.

## IV. Conclusion

For the reasons stated above, Cole Bryant's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the

action is dismissed. Petitioner has failed to make a "substantial showing of a denial of a constitutional right", 28 U.S.C. § 2253 (c)(2), the court declines the issue of certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

**SO ORDERED**.

S/Michael A. Telesca

_____
                MICHAEL A. TELESCA
            United States District Judge

Dated:     April 18, 2011
           Rochester, New York